UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| JANET FLAUGHER, | : | Case No. 3:18-cv-287 |
| --- | --- | --- |
| Plaintiff, | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I. Introduction

After working as a hairstylist for more than twenty-six years, Plaintiff Janet Flaugher applied for period of disability and Disability Insurance Benefits, asserting that she could no longer work. Administrative Law Judge (ALJ) Deborah S. Sanders held a hearing after which she concluded that Plaintiff was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act. Plaintiff brings this case challenging the Social Security Administration's denial of her application benefits.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. #10), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Sanders's non-disability decision.

## II. Background

Plaintiff asserts that she has been under a "disability" since January 17, 2014. She was fifty-five years old at that time and was therefore considered a person of "advanced age" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(e). She has at least a high school education. *See id.* § 404.1564(b)(4).

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Sanders that she stopped working as a hairstylist in 2014 because "the pain … just got too much to handle …." (Doc. #6, *PageID* #s 75-77). She has rheumatoid arthritis that causes "excruciating joint pain" during flares predominately in her wrists, fingers, and ankles. *Id.* at 77-78. She has flares six or seven times a month and they last three to six days. *Id.* at 79. She very seldom has days without pain and when she does, it only lasts for at most, forty-eight hours. *Id.* at 100. In June 2017, "every day, but three days … I hurt from one joint to another." *Id.* at 79. When she reported it to her rheumatologist, Dr. Wolfe, he confirmed that her CCP's[1] were higher. *Id.*

---

[1] "Anti-cyclic citrullinated peptide (anti-CCP) is an antibody present in most rheumatoid arthritis patients. Levels of anti-CCP can be detected in a patient through a simple blood test. A positive anti-CCP test result can be used in conjunction with other blood tests, imaging tests, and/or physical examination findings to diagnose rheumatoid arthritis." Jennifer Freeman, M.D., *RA and Anti-CCO: What is the purpose of an Anti-CCP Test?,* RHEUMATOID ARTHRITIS SUPPORT NETWORK, https://www.rheumatoidarthritis.org/ra/diagnosis/anti-ccp/ (last updated Oct. 27, 2018); *see also Cyclic*

Plaintiff's flares begin as a "nuisance pain"—for instance, at the hearing, her left ankle felt like she hit it on a sharp corner or a step (but constantly). *Id.* at 80. At that stage, her pain is not so bad that she needs to take medication. *Id.* But, "[her pain] builds up, and it gets to a crescendo …." *Id.* At that point, Plaintiff explained, "the best way I can describe it, especially in the wrist, if you can imagine having all of those bones broke and you go just to pick up an ink pen, just moving your finger a little bit, it feels like someone is taking a mallet hammer and hitting that. That's how excruciating it is." *Id.* at 79. When she is having a flare, she lies in bed and cannot move her joints. *Id.* at 101. She does not get dressed or shower. *Id.* She does not do chores, cooking, or needlework and she does not drive. *Id.* at 101-02. She cannot even take care of her bodily functions. *Id.* at 101.

Dr. Wolfe prescribes methotrexate and leucovorin for rheumatoid arthritis. *Id.* at 85. Plaintiff also takes folic acid for the side effects of methotrexate (hair loss). *Id.* She also takes Tylenol Arthritis, prednisone, and aspirin. *Id.* She only takes prednisone when her flares are "really, really bad"—one to three times a month. *Id.* at 85-86.

Plaintiff has osteoarthritis—and pain—in her lower back. *Id.* at 80-82. Her pain is "like a medium-sized ball in the lower lumbar area, probably about the size of a muskmelon." *Id.* at 83. Her pain is sometimes constant and Plaintiff attributes that to the weather. *Id.* at 82. It is worse if she stands too long or sits too long and she cannot bend

---

*Citrullinated Peptide Antibody*, LAB TESTS ONLINE, A PROGRAM OF THE AMERICAN ASSOCIATION FOR CLINICAL CHEMISTRY, https://labtestsonline.org/tests/cyclic-citrullinated-peptide-antibody (last modified Apr. 11, 2019).

or stoop. *Id.* at 83. When she wakes up in the morning, her back is stiff and she has to do exercises in bed before getting up. *Id.* at 82. She has to "3.2 turn" to get out of bed. *Id*. According to Plaintiff, a 3.2 turn is "like [getting out of] a car … you've got to … turn, turn and turn." *Id.* at 81-82.

Because methotrexate lowers Plaintiff's immune system, "Skin cancers … keep popping up …." *Id.* at 88. When they do pop up, she sometimes has to have them excised. *Id*. Plaintiff sees a specialist at Dayton Skincare every six months.

In addition, Plaintiff has cardiac problems. Her cardiologist, Dr. Rink, performed an angioplasty in 2015. *Id.* at 88. She nonetheless continued to experience cardiac issues; her pinky toe turned a dark purple. *Id.* at 89. Dr. Rink put a stent on the right side. *Id*. According to Plaintiff, she did not have any problems on her right side until he put the stent in. *Id*. Since the stent, Plaintiff "can't walk very far without stopping and letting the blood drain …. I think they call it claudication." *Id*.

Plaintiff lives with her husband. *Id.* at 73. She has a driver's license and but does not drive very often—not unless it is necessary. *Id*. If she does drive, it is typically to the bank, her doctor appointments, or the grocery store. *Id.* at 74. Plaintiff's husband does most of the grocery shopping. *Id.* at 94.

On a typical day, Plaintiff tries to get up at 7 AM before her husband leaves for work but it is usually 7:30 or 8 AM. *Id.* at 93. Around 10 AM, she lets her dog out and then watches the news. *Id*. She sometimes takes a mid-morning nap. *Id*. Then she has lunch and at 2 PM, she naps for up to an hour-and-a-half. *Id*. When she wakes up, she lets her dog out and watches TV until her husband gets home. *Id*. Plaintiff makes dinner

most of the time. *Id*. But her husband has to make dinner when her wrists or fingers will not let her. *Id*. She estimated she makes dinner, on average, three times a week. *Id.* at 94. But her cooking has changed. For example, she cannot peel potatoes very often so they have a lot more baked potatoes. *Id.* at 97. Plaintiff dusts and does laundry; her husband vacuums. *Id.* at 94.

Even though Plaintiff naps one or two times a day, she still experiences fatigue. *Id.* at 97. She feels listless and limited. *Id*. Plaintiff has a treadmill and tries to walk on it but she prefers to walk outside. *Id*. at 91. She goes on walks two to three times a month. *Id*. Plaintiff cannot walk very far before needing to stop: "The only example I have that I can give you is like when you go into Walmart and you have to use the bathroom and you're in front of the store, to get to the back of the store I'll have to stop two or three times for a couple minutes." *Id.* at 95. She has to stop because her right hip hurts. *Id.* at 94. She can sit for up to thirty-five minutes before needing to shift positions. *Id.* at 95. She cannot carry water-softener salt that weighs ten to fifteen pounds. *Id.* at 96. But, she can pick up her 9.8-pound dog. *Id.* at 96.

Plaintiff's hobbies include all needlework except petit point. *Id.* at 89. She can crochet for up to thirty-five minutes before her forearm gets tight and she has to take a break for up to an hour-and-fifteen minutes. *Id.* at 90. In general, she does not often start her needlework. *Id.* at 98. She recently stitched squares (that she already had) together and it took her three weeks because of problems with her wrist and thumbs. *Id*. She had to work on it every day but usually could only work on it for fifteen to twenty minutes

before needing a break.  *Id.* at 99.  Ten or fifteen years before the hearing, she could have assembled the squares in one-and-a-half to two days.  *Id.*

### B. Medical Opinions

#### i. *James D. McNerney, M.D.*

Plaintiff's treating physician, Dr. McNerney, completed a medical impairment questionnaire in May 2016.  He diagnosed rheumatoid arthritis, uncontrolled diabetes, hyperlipidemia, and peripheral artery disease.  *Id.* at 401.  He noted that Plaintiff's symptoms include joint and muscle pain; shortness of breath; decreased wrist, elbow, shoulder range of motion; and fatigue.  *Id*.  Her pain is moderate.  *Id.* at 402.

Dr. McNerny opined that Plaintiff could stand for fifteen minutes at one time, sit for one hour at one time, work one hour per day, and lift up to five pounds on an occasional basis (none on frequent basis).  *Id.*  She can occasionally bend and balance but cannot stoop, use her hands for manipulation, or raise her arms over shoulder level.  *Id.* at 401-02.  She needs to elevate her legs occasionally.  *Id.* at 402.  He concluded Plaintiff cannot work fulltime without being absent more than twice a month or being off task more than fifteen percent of the workday.  *Id.*

#### ii. *Sandford M. Wolfe, M.D.*

Dr. Wolfe, Plaintiff's treating rheumatologist, completed a medical impairment questionnaire in June 2016.  He diagnosed rheumatoid arthritis and noted that she has

positive serum rheumatoid factor tests.² *Id.* at 459. Plaintiff's symptoms include significant fatigue and mild malaise. *Id.* at 460. She also has a history of morning stiffness and of joint pain, swelling, and tenderness. *Id.* at 549. At Plaintiff's most recent examination, she had inflammation in her hands, shoulders, and wrists. *Id.*

Dr. Wolfe opined that she could stand for fifteen minutes at one time and sit for one hour. *Id.* at 461. She can work for one hour per day. *Id.* She can occasionally lift up to five pounds and can occasionally bend. *Id.* She cannot stoop, use her hands for fine manipulation, or raise her arms above shoulder level. *Id.* She is unable to perform fine and gross movements effectively. *Id.* at 459.

      *iii.*     *David Knierim, M.D., Mary K. Hill, Ph.D., & Steve E. McKee, M.D.*

Dr. Knierim reviewed Plaintiff's records in June 2015. He found that she had two non-severe impairments, inflammatory arthritis and diabetes mellitus. *Id.* at 120. He concluded that she was not under a disability. *Id.* at 121.

In September 2015, Dr. Hill reviewed Plaintiff's records and found she had one non-severe impairment, diabetes mellitus, and one severe impairment, inflammatory arthritis. *Id.* at 128. Dr. McKee reviewed her records in August 2015. He opined that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently. *Id.* at 130. She can stand and/or walk for a total of six hours in an eight-hour

---

² "A rheumatoid factor test measures the amount of rheumatoid factor in your blood. Rheumatoid factors are proteins produced by your immune system that can attack healthy tissue in your body." *Rheumatoid Factor*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/rheumatoid-factor/about/pac-20384800 (last visited Sept. 12, 2019).

7

workday and sit for six hours. *Id.* He, like Dr. Knierim, concluded that Plaintiff was not under a disability. *Id.* at 131.

### III.  Standard of Review

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.*

*Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ Sanders to evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering the sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. She reached the following main conclusions:

- Step 1: Plaintiff has not engaged in substantial gainful employment since January 17, 2014.

- Step 2: She has the severe impairments of rheumatoid arthritis; osteoarthritis and degenerative disc disease of the lumbar spine; peripheral arterial disease; and diabetes mellitus, type II.

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … with lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and/or walking for six hours out of an eight-hour day, and sitting six hours out of an eight-hour day. She is limited to occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds, and frequent fine and gross manipulation. She is to avoid concentrated exposure to extreme heat and cold."

Step 4: She is capable of performing past relevant work as a cosmetologist.

(Doc. #6, *PageID* #s 45-56). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 56.

## V. <u>Discussion</u>

Plaintiff contends that the ALJ failed to reasonably weigh the opinions of her long-time treating sources and no medical opinion evidence supports the ALJ's findings. Further, the ALJ made unreasonable and unsupported findings regarding her daily activities.

### A. **Medical Opinions**

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

ALJ Sanders concluded that Dr. McNerney's and Dr. Wolfe's opinions are not entitled to controlling or deferential weight because they are "not fully supported by the record." (Doc. #6, *PageID* #54). Plaintiff correctly observes that the treating physician rule does not require an opinion be fully supported by the record: "For a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic

11

techniques, it is not necessary that the opinion be *fully* supported by such evidence." Soc. Sec. R. 96-2p, 1996 WL 374188, *2 (July 2, 1996). Thus, to the extent the ALJ required Dr. McNerney's and Dr. Wolfe's opinions to be fully supported, she erred.

The ALJ assigned their opinions "little weight" and gave several reasons. Although the ALJ evaluated Dr. McNerney and Dr. Wolfe's opinions separately, she gave most of the same reasons for rejecting both. Thus, it makes sense to address their opinions together.

The ALJ first addressed the doctors' opinion that Plaintiff could stand for fifteen minutes at one time, sit for one hour at one time, work for one hour per day, and lift five pounds. She found that their opinions are "inconsistent with the record, which shows [Plaintiff] is capable of walking a mile on a treadmill, and her testimony, wherein she estimated she could lift ten to fifteen pounds and stated she has no trouble picking up her nearly ten pound dog." (Doc. #6, *PageID* #54).

The ALJ did not cite any record in support of her conclusion that Plaintiff is able to walk one mile on a treadmill. Although the ALJ did provide a citation earlier in her decision, the page she cites does not exist. (Doc. #6, *PageID* #s 53) (citing Exhibit 10F/11). She cited Exhibit 10F, page 11 but Exhibit 10F is only nine pages long. *See* Doc. #6, *PageID* #s 403-11. The Commissioner cites to one note from Plaintiff's cardiologist, Dr. Rank, who indicated on November 17, 2015, "She has been walking 1 mile per day on the treadmill and is tolerating it quite well." *Id.* at 409. However, Dr. Rank's note is an outlier and "a substantiality of evidence evaluation does not permit a selective reading of the record. 'Substantiality of the evidence must be based upon the

12

record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting, in part, *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984) (internal citations and quotation marks omitted).

Dr. Rank's note is not supported by other evidence in the record. For instance, Dr. McNerney noted on six occasions between September 2013 and May 2016 that Plaintiff had decreased exercise tolerance and/or difficulty breathing on exertion. (Doc. #6, *PageID* #s 304, 307, 313, 413, 417, 423). Further, Dr. McNerney notes at three appointments that Plaintiff "engages in no regular exercise." *Id.* at 304, 307, 422. On March 17, 2016, Dr. McNerney noted that Plaintiff was "just starting floor exercises." *Id.* at 416. Finally, on December 7, 2016, Dr. McNerney noted that Plaintiff tries to walk on a treadmill but her hip will not stay in place. *Id.* at 556. Dr. McNerney's and Dr. Wolfe's opinions are consistent with Dr. McNerney's frequent notes related to Plaintiff's inability to exercise.

The parties disagree on the meaning of Plaintiff's hearing testimony regarding how much she can lift. Plaintiff contends that she testified that she cannot lift ten to fifteen pounds. (Doc. #7, *PageID* #618). The ALJ and Commissioner assert that she stated she could. (Doc. #9, *PageID* #s 630, 635-36).

> Q Okay. How much would you say you could lift and carry at one time?
> A I've never had strength in my arms, so I don't know. I'm trying to think - -
> Q Okay.

13

> A - - of a - - I can't carry the water softener, that's too heavy, that maybe 10/15 pounds.

(Doc. #6, *PageID* #s 95-96).

Plaintiff's response is somewhat puzzling. Given that she testified (very shortly after the response at issue) she could lift her almost ten-pound dog, it is likely that she meant she could lift ten to fifteen pounds. However, either way, her testimony is not meaningfully inconsistent with the doctors' opinion that she could lift five pounds occasionally. Although the ALJ is correct that she said she can lift her dog (and assuming Plaintiff meant she could lift and carry ten to fifteen pounds), she did *not* testify that she could do so occasionally—for up to 2.5 hours. There is a significant difference between the ability to lift/carry ten to fifteen pounds and the ability to lift/carry five pounds for up to 2.5 hours. Because the doctors did not opine that Plaintiff was never capable of lifting more than five pounds, Plaintiff's testimony is not inconsistent with their opinions.

The ALJ also took issue with Dr. McNerney's opinion that Plaintiff could not use her hands for manipulation and Dr. Wolfe's opinion that she could not use her hands for fine manipulation. *Id.* at 54-55, 401, 461. The ALJ indicates that Dr. Wolfe "not[ed] no limitations with gross manipulation of the hands …." *Id.* at 54. But he did not provide an opinion on Plaintiff's ability to use her hands for gross manipulation, he did not respond to question at all. *Id.* at 401, 461. Nevertheless, the ALJ found that these manipulation limits are inconsistent with the record. Specifically, a day before he provided his opinion, Plaintiff told Dr. McNerney that she can sew and do needlework for

14

fifteen minutes at time. *Id.* at 54 (citing 11F/1). Further, she testified at the hearing that she could crochet for thirty to thirty-five minutes at a time. She is also able to quilt and do needlework. The ALJ is correct to the extent that, on May 24, 2016, Plaintiff reported to Dr. McNerney that she can sew or do needle work for fifteen minutes. She also explained that after fifteen minutes, her "forearm muscles swell up to point where it is hard to hold onto material." *Id.* at 412. In addition, she testified that she needs to stop for at least forty-five minutes to an hour-and-fifteen minutes before she can start again. *Id.* at 90. On their impairment questionnaires, Dr. McNerney and Dr. Wolfe had four options for their response—never, occasionally, frequently, or constantly. Occasionally is defined as up to 2.5 hours. Plaintiff's activities—even thirty-five minutes of crocheting—is far from 2.5 hours. Thus, the doctors' opinions that Plaintiff could not use her hands for manipulation are not inconsistent with Dr. McNerney's notes or Plaintiff's testimony. Notably, Dr. McNerney has treated her hand pain since at least January 16, 2007 (although there was an over two-year gap where he did not treat Plaintiff (December 15, 2008 to April 25, 2011)). *Id.* at 330, 333, 349.

The ALJ also found their opinions that Plaintiff is not able to raise her arms above shoulder level were inconsistent with the record. She noted, "almost all of her physical examinations note a normal range of motion in all joints, even on the visits where she reported shoulder pain." *Id.* at 54. But the ALJ overlooks Dr. Wolfe's note regarding Plaintiff's symptoms. He acknowledged that Plaintiff "has had more flares, though a lot of her symptoms are subjective as we don't really see much on joint examination today.

Still prednisone can sometimes mask some of the signs that we would normally see." *Id.* at 469.

Further, the ALJ forgets that rheumatoid arthritis is not Plaintiff's only impairment and is not the sole cause of her limitations. For example, in September 2016, an x-ray showed "lots of degenerative arthritis in [her] back." *Id.* at 463, 606. Dr. Wolfe noted it was osteoarthritis, not rheumatoid arthritis. An MRI of Plaintiff's lumbar spine in June 2017 revealed degenerative disc disease L4-5 with some facet arthropathy resulting in right greater than left lateral recess stenosis and some mild right foraminal narrowing. *Id.* at 605. Together, this evidence supports Dr. McNerney's and Dr. Wolfe's opinions regarding Plaintiff's ability to lift her arms above her shoulders.

Looking at only Dr. Wolfe's opinion, the ALJ discounted his opinion that Plaintiff's rheumatoid arthritis caused mild-to-moderate limitations in activities of daily living. The ALJ found that his opinion was "not consistent with the work restrictive limitations he opined." *Id.* at 55 (citing Exhibit 12F). However, the ALJ does not provide any further explanation. She did not point to any specific limitation opined by Dr. Wolfe that conflicts with his opinion that she has a mild-to-moderate restriction of activities of daily living. And, she did not address his note that Plaintiff's HAQ score is 1.38.[3]

---

[3] The Health Assessment Questionnaire Disability Index (HAQ) measures the functional status of adults with rheumatoid arthritis and osteoarthritis. Leann Maska, Jaclyn Anderson, & Kaleb Michaud, *Measure of Functional Status and Quality of Life in Rheumatoid Arthritis*, ARTHRITIS CARE & RESEARCH Vol. 63, No. S11 (2011). Results are assessed on a scale between 0 and 3, with 0 – "without any difficulty"; 1 – "with some difficulty"; 2 – "with much difficulty"; and 3 – "unable to do." *Id.* Plaintiff's HAQ score of 1.38 indicates that she can complete activities of daily living with some or much difficulty.

Turning to Dr. McNerney's opinion, the ALJ found, "There is no support for the restrictive limitations suggested by Dr. McNerney." *Id.* at 54. The ALJ provides no explanation. And, there is support for his opinion. Most obviously, Dr. Wolfe's opinion and Plaintiff's testimony support Dr. McNerney's opinion. As described above, Dr. McNerney's treatment notes support his opinion.

Although the ALJ provided reasons for discounting Dr. McNerney's and Dr. Wolfe's opinions, substantial evidence does not support her reasons. Thus, they do not constitute "good reasons" for rejecting their opinions under the Regulations. "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007)).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[4]

B.  **Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

17

right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and

to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

**IT IS THEREFORE ORDERED THAT**:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Janet Flaugher was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.

September 17, 2019                  *s/Sharon L. Ovington*
                                                      Sharon L. Ovington
                                                      United States Magistrate Judge